# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

——————

No. 19-60716

——————

United States Court of Appeals
Fifth Circuit

**FILED**
June 30, 2020

Lyle W. Cayce
Clerk

MARK ESTABROOK,

       Petitioner,

v.

ADMINISTRATIVE REVIEW BOARD, UNITED STATES DEPARTMENT OF LABOR,

       Respondent,

FEDERAL EXPRESS CORPORATION,

       Intervenor.

——————————

Petition for Review of the Final Decision and Order of the
United States Department of Labor, Administrative Review Board
LABR No. 17-0047

——————————

Before KING, GRAVES, and OLDHAM, Circuit Judges.

PER CURIAM:*

    Mark Estabrook filed a complaint with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA"). In it, Estabrook alleged that Federal Express Corporation ("FedEx") violated air-carrier-safety whistleblower-protection laws. An administrative tribunal dismissed the

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 19-60716

complaint. Because substantial evidence supports the tribunal's decision, we deny Estabrook's petition for review. We also reject his challenge to a ruling by the tribunal regarding attorney-client privilege.

I.

A.

Mark Estabrook is an experienced airline pilot. On April 10, 2013, while working for FedEx, Estabrook was scheduled to fly from Laredo, Texas, to Memphis, Tennessee. Because of severe weather between Laredo and Memphis, Estabrook notified his dispatcher that the flight time would be delayed. Ordinarily, in the event of weather delays, the pilot goes to the airport and prepares the plane to fly whenever the weather clears. But based on conversations with the dispatcher, Estabrook thought that he was permitted to remain at his hotel. So that's what he did.

Estabrook said that FedEx pressured him to fly in unsafe conditions. And, in late April, he filed a complaint with OSHA about the incident. In early May 2013, as part of an internal FedEx investigation into what happened in Laredo, Estabrook met with his supervisor. After realizing that Estabrook's failure to show up at the airport was due to a misunderstanding, the supervisor told him that FedEx would not take disciplinary action. With that reassurance, Estabrook withdrew his OSHA complaint.

On August 4, 2013, Estabrook sent an ominous email to FedEx's chief pilot, requesting a meeting with FedEx CEO Fred Smith:

> I need to talk to Fred. It has nothing to do with Flight Ops or you. It deals with something related to 9-11. I did my best to protect the company and reported as much as I could through [FedEx Corporate Security] when I was the Security Chairman at [the Airline Pilots' Association]. Ask Fred to call me on my cell but realize I turn it off when I sleep. I am about to close my eyes and call it a day.

2

The next day, FedEx placed Estabrook on "Not Operationally Qualified" status. This status prevented Estabrook from flying but did not affect his pay. The parties dispute why FedEx grounded Estabrook. Whatever the reason, it cleared Estabrook's schedule for a meeting to discuss his request.

That meeting took place on August 9. Although the CEO did not attend, senior members of FedEx's aviation division were present. At the meeting, Estabrook recommended that FedEx stop making flight- and package-tracking data available to the public. He worried that terrorists could make use of that data to detonate a bomb on a FedEx plane mid-air. Estabrook had raised the same concerns with FedEx management in 2002 but had not broached the issue since.

During the meeting, Estabrook also brought up a former colleague, Auburn Calloway. In 1993, Calloway, then a FedEx pilot, "attempted to hijack [a] plane after he faced termination by the company for lying about his flight hours." He has been in prison ever since. Estabrook said that he wanted the CEO to know that Estabrook "ha[d] heard twice in the past six . . . months that Auburn Calloway ha[d] converted to Islam." In Estabrook's view, Calloway's rumored conversion required FedEx to "go to the Department of Justice and request eavesdropping on his jail cell" because "Calloway may be using a communication path to al Qaeda." He offered no basis for this view other than his belief that Calloway was Muslim.

Immediately after the meeting, Estabrook's supervisor told him that he would be returned to flight status in twenty minutes. Later that day, however, the supervisor informed Estabrook that he was being grounded again and that he would be required to pass a psychiatric evaluation. Estabrook objected but complied. After four months of dueling doctors' opinions, Estabrook received a

3

No. 19-60716

positive evaluation and returned to work, his pay and job status unchanged. Once again, Estabrook filed an OSHA complaint.

B.

Air-carrier employees are afforded protection against retaliation for telling their employer or the Government about suspected violations of air-carrier safety rules. *See* 49 U.S.C. § 42121(a)(1); 29 C.F.R. § 1979.102(a)–(b). Estabrook's OSHA complaint alleged that he had engaged in three such protected activities: refusing to fly in Laredo, filing the April 2013 OSHA complaint, and making safety recommendations in the August 9, 2013 meeting. The complaint further alleged that the two groundings in August and the requirement that he submit to a medical evaluation constituted retaliation (also known as "unfavorable personnel action[s]," 49 U.S.C. § 42121(b)(2)(B)(i), or "adverse personnel action[s]," 29 C.F.R. § 1979.104(b)(2)) for those protected activities.

After an investigation, the Department of Labor determined that FedEx had not violated the whistleblower statute and dismissed the complaint. Estabrook objected to the decision and requested a hearing before an Administrative Law Judge ("ALJ").

The ALJ concluded that Estabrook's refusal to fly in April, along with his related April 2013 complaint, were protected activities. Additionally, the ALJ held that the two groundings in August 2013 and the compulsory medical evaluation amounted to unfavorable personnel actions. The parties do not seek review of these conclusions.

The ALJ also found that Estabrook had not proven that he engaged in a protected activity during the August 9 meeting. Although Estabrook urged FedEx to improve its safety practices, the ALJ saw no reasonable basis for Estabrook to believe that FedEx was breaking the law by failing to implement

4

those practices. The ALJ also found that Estabrook's protected activities in April did not contribute to the adverse personnel actions in August. The ALJ therefore dismissed Estabrook's complaint.

Estabrook appealed the ALJ's decision to the Department of Labor's Administrative Review Board. The Board affirmed the ALJ's findings. Estabrook timely petitioned this court for review.

## II.

An employee that has suffered retaliation for reporting a violation of air-carrier safety rules can file a complaint with OSHA. *See* 49 U.S.C. § 42121(b)(1). To establish a prima facie case, the employee must show that (1) the employee engaged in protected activity; (2) the employer knew or suspected that the employee engaged in protected activity; (3) the employee suffered an unfavorable personnel action, and (4) circumstances permit an inference that the protected activity was a contributing factor in the unfavorable personnel action. *See* 49 U.S.C. § 42121(b)(2)(B); 29 C.F.R. § 1979.104(b)(1).

Estabrook argues that his conduct in the August 9 meeting was protected activity and that his grounding and medical evaluation were retaliation for that activity. In any event, he argues that his protected activities in April at least contributed to the unfavorable personnel actions. We review these arguments through the lens of the Administrative Procedure Act. *See* 49 U.S.C. § 42121(b)(4)(A). That means we consider legal arguments *de novo*, *see Ameristar Airways, Inc. v. Administrative Review Board*, 771 F.3d 268, 272 (5th Cir. 2014), and set aside factual findings if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence," 5 U.S.C. § 706(2)(A), (E).

With these standards in mind, we decline to interfere with the Department of Labor's dismissal. We start by holding that substantial evidence

No. 19-60716

supported the ALJ's conclusion that Estabrook's August 9 comments were not protected activity. Then we hold that substantial evidence supported the finding that Estabrook's protected activities did not contribute to the adverse actions against him.

A.

We start with Estabrook's August 9, 2013, comments about FedEx security practices. The Department of Labor takes the view that an employee's statements are protected if he or she believes that a violation of air-carrier safety rules exists. *Sewade v. Halo-Flight, Inc.*, ARB No. 13-098, 2015 WL 1005044, *5 (ARB Feb. 13, 2015). But this belief must be "subjectively and objectively reasonable." *Id.* Estabrook does not challenge this articulation of the law, so we assume without deciding that it is correct.[1]

The ALJ found that Estabrook's belief was neither subjectively nor objectively reasonable. Regarding subjective reasonableness, the ALJ noted that, by 2013, Estabrook had known for over ten years that tracking data was publicly available. Moreover, Estabrook knew that, for several years, U.S. intelligence agencies had been aware of terrorists' plans to make use of tracking data. Yet the Government had not curtailed it. In the ALJ's view:

> Surely, given this revelation, had the intelligence community believed the disclosure of package and flight data compromised air safety, the FAA, TSA, or some other federal agency would have alerted [FedEx] that such disclosure constituted a violation, and [FedEx] would have been required to address the disclosures

[1] OSHA notes that its standard is in line with our interpretation of the whistleblower provision in the Sarbanes-Oxley Act. There are considerable differences between the two statutes, however. Sarbanes-Oxley protects an employee who reports what he or she "reasonably believes constitutes a violation" of certain securities law. 18 U.S.C. § 1514A(a)(1). There, the statute explicitly provides the reasonable-belief standard. Section 42121, on the other hand, describes the reporting of "any violation or alleged violation," with no mention of the reasonableness of the employee's beliefs. 49 U.S.C. § 42121(a). Because we assume for purposes of this case that OSHA's reasonableness test is correct, we need not consider the import of these textual differences.

shortly thereafter. No evidence in the record suggests that this occurred.

As for objective reasonableness, the ALJ noted that the availability of "package tracking information and flight tracking information . . . is well known to the general public." Again:

> Surely, if such practices represented a violation of FAA or TSA regulations, those agencies charged with aviation safety and security oversight would have addressed the matter at some point over a fifteen-year period since the September 11 attacks, or at least since the highly-publicized 2010 reports referenced by [Estabrook].

And, as Estabrook concedes, it is the FAA—not FedEx—that makes flight-tracking data available to the public. True, carriers can opt out of public disclosure. But all that matters is that the FAA permits disclosure of the data, so that disclosure does not violate the law. And, as the ALJ noted, the mere potential for improving security "does not mean that [FedEx] was violating any law or regulation." We therefore leave in place the agency's conclusion that Estabrook's August 9 comments were not protected under the whistleblower statute.

B.

Estabrook next alleges that his refusal to fly in April 2013 and his first OSHA complaint contributed to the unfavorable personnel actions in August 2013—the grounding and the mandatory medical evaluation. The ALJ disagreed. Because the ALJ relied on substantial evidence to reach that conclusion, we will not interfere with this conclusion either.

Substantial evidence shows that the grounding and medical evaluation were motivated by Estabrook's unusual behavior. Estabrook was familiar with the protocol for reporting safety concerns. He chose not to follow that protocol. Instead, he sent his boss a demand for an audience with the CEO, accompanied

by a cryptic reference to the terrorist attacks of September 11th. That conduct would be troubling coming from any employee—to say nothing of the fact that Estabrook was an active pilot.

The record shows that Estabrook did little to allay FedEx's concerns about his mental health at the August 9 meeting. That was when he suggested asking the Government to monitor Auburn Calloway's prison conversations— a suggestion sparked only by Estabrook's belief that Calloway had converted to Islam. The ALJ concluded that it was these comments (taken together with the August 4 email) that triggered the decision to ground Estabrook and require a medical evaluation.

Estabrook counters that, even if the August outburst had been the principal motivating factor, lingering anger from the April confrontation contributed to the adverse actions in August. (Recall that, under the whistleblower statute, the protected activity need only be a "contributing factor" resulting in the unfavorable personnel actions. 49 U.S.C. § 42121(b)(2)(B)(iii).) In particular, Estabrook contends that (1) he presented to the ALJ evidence linking his actions in April with FedEx's actions in August; (2) the temporal proximity between the April protected activity and the August adverse actions sufficed to demonstrate retaliation; and (3) the ALJ afforded too much weight to certain evidence proffered by FedEx. The contributing-factor criterion is a particularly relaxed causation requirement. *See Allen*, 514 F.3d at 476 n.3 ("A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." (quotation marks omitted)). We consider and reject each of these three arguments in turn.

8

1.

We start with the evidence supposedly linking Estabrook's protected activity in April with FedEx's actions in August. The ALJ found "little, if any, evidence" to connect the two. Estabrook rejoins that, during the August 9 meeting, he was asked about "Mayday Mark," the pseudonym of a pilot on an internet forum who posted details of an incident that resembled what happened to Estabrook in Laredo. In Estabrook's view, this confirms that FedEx was thinking about the April 2013 Laredo incident during the August 2013 meeting.

The problem is that Estabrook showed during the August meeting that he was not "Mayday Mark." The two pilots' flight service information did not match. And the record—including Estabrook's own complaint—reflects that "FedEx accepted Estabrook's denial when he stated and verified that he was not Mayday Mark." There is therefore substantial evidence to support the ALJ's finding that FedEx's decision to ground Estabrook and require an evaluation were unrelated to the April incident in Laredo.

The record also shows that any ill-feeling toward Estabrook from the April incident resulted from Estabrook's failure to arrive at the airport, not his refusal to fly. The implication of this evidence is that, even if members of FedEx management continued to harbor a grudge against Estabrook in August, it was due to Estabrook's failure to turn up to work—an unprotected activity—not his refusal to fly. That's another piece of evidence supporting the ALJ's rejection of Estabrook's contribution argument.

Additionally, Estabrook's August 4 demand to talk to the CEO was not protected activity. As Estabrook himself acknowledged, his demand did not include an explanation "that he was reporting a violation of an FAA law or regulation." Given that Estabrook believes the real reason he was grounded on

August 5 was "the content of his August 4 email," that grounding was not in response to a protected activity. In any event, the ALJ credited the evidence during the hearing that the first grounding was "to ensure [Estabrook's] presence for" the April 9 meeting. Substantial evidence therefore also shows that Estabrook's April conduct did not contribute to the August 5 grounding.

2.

Second, Estabrook says that the unfavorable personnel action happened sufficiently close in time to his protected conduct to satisfy his burden of showing retaliation. He relies on regulatory guidance that provides that, "[n]ormally," a complainant's "burden is satisfied . . . if the complaint shows that the adverse personnel action took place shortly after the protected activity, giving rise to the inference that it was a factor in the adverse action." 29 C.F.R. § 1979.104(b)(2).

On the other hand, the fact-finder need not rely on circumstantial timing evidence when there is *direct* evidence of an intervening act that supplies a non-retaliatory motive. *See Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) ("[T]he causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." (quotation marks omitted)). That's what happened here. As noted above, the ALJ properly relied on evidence that FedEx did not harbor a grudge against Estabrook for his protected activity. And the record indicates that it was Estabrook's behavior in August—much closer temporally than his April activity—that resulted in his grounding and mandatory evaluation. These findings sufficed to negate any inference that Estabrook's protected activity four months earlier played a part in the unfavorable personnel action.

3.

Next, Estabrook faults the ALJ for crediting testimony from witnesses whom he considers to be unworthy of belief. But as this court has long held, "credibility determinations and the resolution of conflicting evidence are the prerogative of the fact finder[—]here[,] the ALJ." *Atlantic Marine, Inc. v. Bruce*, 661 F.2d 898, 900 (5th Cir. Unit B Nov. 1981). On a petition for review, "[w]e may not reweigh the evidence." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001). We therefore leave undisturbed the ALJ's conclusion that Estabrook's protected activities did not contribute to the unfavorable personnel action.

III.

Last, Estabrook challenges a ruling on attorney-client privilege by the ALJ. That challenge fails as well.

During the administrative hearing, FedEx called its in-house counsel, Robert Tice, to testify. Tice had attended the August 9 meeting. On cross-examination, Tice indicated that the meeting took place because "there were some concerns about whether [Estabrook] should be on the jumpseat." When Tice was asked what the concerns were, FedEx's counsel objected "to the extent that [the question] calls for attorney-client privileged information." The ALJ overruled the objection. Tice replied that the vice-president of flight operations, James Bowman, "question[ed]" whether Estabrook was "an appropriate person to be on a jumpseat." During discovery, FedEx had withheld the relevant communication with Bowman as privileged. But, based on Tice's testimony, Estabrook's counsel sought production of the email. FedEx reasserted its privilege over the email, so the ALJ ordered that FedEx provide him with a copy of the document for *in camera* inspection. After a review of the email, the

ALJ determined that it was covered by attorney-client privilege or the work-product doctrine and therefore protected from disclosure to Estabrook.

Estabrook's position is that FedEx waived the attorney-client privilege when Tice testified about the content of the email. Not so. A party prevents the waiver of attorney-client privilege at trial by asserting that privilege whenever the opposing party asks "questions designed to elicit information about privileged communications." *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th Cir. 1999). FedEx did just that when Tice was presented with a question that might elicit privileged information. FedEx did not waive its privilege. *Cf. id.* (holding that defendant "waived the attorney-client privilege by its failure to assert the privilege" when plaintiff asked questions designed to elicit privileged information).

Nor was privilege waived when the ALJ overruled the objection and required Tice to answer the question. Typically, waiver of privilege must be voluntary. *See* 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 93 (8th ed. 2020). Thus, "[a] claim of privilege is not waived by a disclosure that was compelled erroneously." *Id.* at n.8 (citation omitted). Because the ALJ later determined that the email was privileged, his initial ruling on the privilege objection must have been erroneous. FedEx therefore did not waive its privilege when Tice testified over FedEx's timely objection. The ALJ was correct to withhold the email from Estabrook.

\*       \*       \*

The petition for review is DENIED.